STATE OF MISSOURI on the Information of J. E. TAYLOR, Attorney General, Relator, v. SALARY PURCHASING COMPANY, Incorporated, of Missouri, a Corporation, Respondent.—No. 40615.—218 S. W. (2d) 571.

Court en Banc, March 14, 1949.

*J. E. Taylor*, Attorney General, *C. B. Burns, Jr.*, and *Arthur M. O'Keefe*, Assistant Attorneys General, for relator.

*John Hendren, Henry C. Hinkel, Harold D. Carey* and *Alex L. McAnally* for respondent.

[571] CLARK, J.—Quo Warranto filed in this court by the Attorney General, as relator, alleging that respondent has been and is violating its corporate charter and the state law by loaning money at usurious rates of interest, praying that respondent be fined, ousted from doing business in the State and required to return to its borrowers all sums illegally exacted from them. After we issued our writ and the parties filed their pleadings, we appointed an attorney, Honorable Francis Smith, as our specal commissioner to hear evidence and report as to the law and the facts. His report has been filed, sustaining the allegations of the information in all important particulars, and respondent has filed exceptions.

The record is long. Many witnesses were heard and many exhibits introduced, but, as the testimony mainly follows the same pattern, the essential facts may be compressed into a comparatively small volume.

Respondent was organized as a Missouri corporation and opened an office in Jefferson City in August, 1946. Its charter powers are stated as "to buy, acquire, discount, hold, own, collect, and receive payment of any choses in action, salary or wage [572] accounts, due or to become due to the seller or assignor, whether earned or unearned, and any and all other claims, demands, obligations, rights of action, judgment and choses in action whether evidenced by writing or not."

Respondent's customers were persons of low income, unable to procure credit from banks and other conservative money lenders. They were attracted to respondent's office by alluring advertisements and solicitation through the mail, promising easy money, without security and upon the applicant's signature alone. The usual procedure was as follows: An applicant would go to the office of respondent and ask "to make a loan" or "borrow money." Sometimes, but not always, the person in charge of the office would tell the applicant that the company did not loan money, but would purchase a part of his salary. After a card was filled with certain information about the applicant, he was told that repayment must be made at his next payday. He then signed a contract purporting to be an assignment of earned wages to the amount advanced to him by respondent. The advancements generally ranged from five dollars to fifty dollars. At the next payday the applicant would collect his wages from his employer, go to respondent's office and pay the amount advanced plus the discount charged. In many instances the applicant would execute a new assignment for the same amount and pay the discount charge only. In such instances the new assignment could only be for future unearned wages to secure a prior indebtedness.

Although the assignment authorized respondent to notify and collect from the applicant's employer, this was never attempted. If the

advancement was to be repaid within a week, the discount was usually five or ten per cent; if the debt continued unpaid, as was nearly always true, the discounts collected at succeeding paydays in a year's time would amount to many times the original debt. In one instance an applicant was charged one dollar for the use of ten dollars for one day.

After the information was filed in this case one J. A. Gordon, of Nashville, Tennessee, and a Mr. Diamond, of Dallas, Texas, came to respondent's office and employed Mr. Bothwell, one of respondent's agents, to take promissory notes from applicants who were unable to pay their debts to the company. These notes bear interest at eight per cent per annum and are payable to Gordon. Bothwell continues to work both for respondent and Gordon. When payments are made on the notes the money is deposited in the bank account of respondent and when the account exceeds $500.00 the excess is sent to Gordon at Nashville by check or money order. Cancelled checks and receipts for money orders are sent to the President of the Salary Purchasing Company, Nashville, Tennessee.

The records in the office of the Missouri Secretary of State disclose that J. A. Gordon, giving his address as Birmingham, Alabama, on May 18, 1948, filed under the Fictitious Name Statute that he is operating under the name of Salary Purchasing Company at respondent's address in Jefferson City.

From the foregoing statement it is clear beyond dispute that, if respondent is engaged in lending money, it is doing so in violation of its charter powers and at usurious rates in violation of our statutes. [All references to statutes, unless otherwise specified, will be to sections of Revised Statutes of Missouri, 1939, and Mo. R. S. A.]

Sections 3226-7 fix annual interest rates for the loan of money at six per cent, if no rate is specified, and not to exceed eight per cent if specified in the contract.

Section 4813 provides: "Every person or persons, company, corporation or firm, and every agent of every person, persons, company, corporation or firm, who shall take or receive, or agree to take or receive, directly or indirectly, by means of commissions or brokerage charges or otherwise, for the forbearance or use of money or other commodities, any interest at a greater rate than 2 per cent per month, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, and by imprisonment in the county jail for a [573] period of not less than thirty days nor more than ninety days. Nothing herein contained shall be construed as authorizing a higher rate of interest than is now provided by law."

Respondent denies that it is engaged in lending money; claims that it only buys wages or salaries and that the same is legal both at common law and under Section 3356, which provides: ". . . and all as-

signments of wages, salaries and earnings, not earned at the time the assignment is made, shall be null and void.'' [The constitutionality of this statute was sustained in Heller v. Lutz, 254 Mo. 704, 164 S. W. 123.]

Respondent argues that, as Section 3356 prohibits the assignment of *unearned* wages only, the assignment of *earned* wages is valid. We are forced to concede that bona fide assignments of earned wages were valid at common law and that we now have no valid statute prohibiting such assignments.

Then respondent, while conceding that a part of its business consisted in taking assignments for unearned wages, argues that the only effect of Section 3356 is to make such assignments void and unenforceable and does not transform the transactions into loans. We fail to see any logic in that argument. Respondent was presumed to know and the evidence shows that it actually did know that such assignments were void; that they transferred no right or title in the unearned wages which they purported to assign. Yet respondent did not intend to donate to the applicants the money which it advanced on such void assignments. It intended to create the relation of debtor and creditor. It intended to collect the money so advanced and, whenever possible, it did collect the same with usurious interest. Such void assignments did not constitute sales. They could be nothing but loans and we think they were so intended by both the respondent and the applicants.

Respondent contends that Section 4813, supra, which makes it a criminal offense to loan money at a greater rate of interest than two per cent per month, has been repealed by Section 44 of Article 3 of our new constitution adopted in 1945. That constitutional provision is as follows: ''No law shall be valid fixing rates of interest or return for the loan or use of money, or the service or other charges made or imposed in connection therewith, for any particular group or class engaged in lending money. The rates of interest fixed by law shall be applicable generally and to all lenders without regard to the type or classification of their business.''

Respondent contends that Section 4813 fixes different rates of interest for different classes of lenders and thus conflicts with the constitutional provision above quoted. In support of that contention respondent cites both opinions rendered by this court in Household Finance Co. v. Shaffner, 356 Mo. 808, 203 S. W. (2d) 734. How respondent can construe those opinions in support of its contention we fail to see. Section 4813 was not considered in that case and nothing was there said to indicate that we would regard such a statute as unconstitutional. Section 4813 does not fix rates of interest and its last sentence clearly says that it does not. That sentence, ''Nothing herein contained shall be construed as authorizing a higher rate of interest than is now provided by law,'' recognizes that any rate in excess of that provided by other statutes is illegal, and makes a charge in

excess of two per cent per month punishable by fine or imprisonment. This court sustained the constitutionality of Section 4813 [then numbered 2358] in Ex parte Berger, 193 Mo. 16. Although our constitution did not then contain a provision similar to Section 44 of Article 3, our decision in that case is squarely in point against respondent's contention in the instant case. There the main attack on the statute was that it violated the constitutional provisions which prohibit laws denying equal protection and laws granting special privilege or immunity. We held that the statute did not grant to any person the privilege of taking interest beyond the legal rate; that it would have been competent for the law to have declared the taking of usury in any amount a crime, but [574] that the law was not unreasonable in denouncing as criminal only the taking of interest beyond two per cent per month. We said, "Certainly it would seem that two per cent per month would gratify the greed of the most unconscionable usurer." The effect of our decision in that case is that all usury is illegal, but that the law may define how and in what degree it may be classed as a crime. Other laws are based on the same principle; for instance, it is a misdemeanor to steal $29.00, but a felony to steal $30.00.

Respondent places great reliance upon the form of the assignments which it required the applicants to execute. Those assignments, on their face, purport to evidence the purchase of earned wages. But, as was said in Fidelity Loan Guarantee Co. v. Baker, 54 Mo. App. 79, l. c. 84:" . . . There is no device or shift to evade the statute under or behind which the law will not look in order to ascertain the real motive of the transaction, and no act, however formal, however solemnly executed, will stand in the way of the court getting at the truth in order to ascertain whether there has been an attempt to evade the statute. And the contract will not be held good merely because upon is face and by its words it appears free from the taint of usury. . . ."

The evidence shows that the major portion of respondent's business consisted in taking void assignments of unearned wages, which transactions constituted the lending of money at usurious rates. The evidence further shows that all of respondent's business consisted in taking partial assignments, that is, for only a part of the wages to become due the assignors at the next payday, which assignments respondent well knew could not be enforced against the employers. Respondent never attempted nor intended to collect from the employers, for each applicant was instructed to collect his wages from his employer.

McWhite v. State, 143 Tenn. 222, 226 S. W. 542:

"On the papers such a transaction is not a loan. It is an assignment of wages which has been upheld by this court, Spicer v. King Bros. & Co., 136 Tenn. 413, 189 S. W. 865.

"As a matter of fact, however, we think the jury were fully justified in concluding that the real transaction was a loan, and that the assignment was a device to cover up the loan. From the foregoing it is obvious that these assignments were not taken with the idea of enforcing them, except as a last resort. They were not presented to the railroad company generally on the next pay day, but the employees were permitted to draw such amounts as were due them, and the employees were trusted to get their money and come around and settle with the brokerage company. The assignment was obviously taken as a security for the money advanced, and as something to be held over a customer who did not make prompt settlement.

"If the written assignment had represented the entire transaction, the brokerage company would naturally have filed it with the railroad company, drawn the money assigned, and the matter would have been closed. The brokerage company, however, as we have seen, rarely attempted to enforce its rights as assignee, but, on the contrary, in nearly all cases, permitted the employee to disregard the assignment and trusted to him to return the money advanced.

"We think this is clearly an extension of credit, an advance, or loan, to the employee, with the assignment held over the employee as a sort of club or collateral security.

"It is well settled by our cases that in all transactions of this character the court will disregard the form of the matter, and will look to its real substance. . . . ' '.

Respondent began business in Missouri within a little more than a year after the effective date of our new constitution, Section 44 of Article 3 of which invalidated our Small Loan Laws. Its principal officers are located outside the state and soon after the information was filed in this case respondent began to transfer its surplus [575] money beyond our jurisdiction. The respondent corporation is now here as a traveler virtually without luggage. Under all the evidence we are justified in holding that respondent deliberately engaged in making small loans at usurious rates under the guise of purchasing wages. Under similar facts the courts have generally reached a like conclusion. [Parsons v. Fox, 179 Ga. 605, 176 S. E. 642; Wilmarth v. Heine, 121 N. Y. Supp. 677; In re Cleapor, 16 F. Supp. 481; In re Brown, 24 F. Supp. 166; Martin v. Pacific Mills, 160 S. C. 458, 158 S. E. 831; State ex rel. v. Central Purchasing Co., 118 Neb. 383, 225 N. W. 46; Tennessee Finance Co. v. Thompson, 278 F. 597; Cotton v. Cooper, 160 S. W. 597; (Tex. C. C. A.) Portwood v. Bennett Trading Co., 184 Ga. 617, 192 S. E. 217; McWhite v. State, 143 Tenn. 222, 226 S. W. 542.]

We are without jurisdiction to comply with that part of the information praying an order to require respondent to return to its customers the sums illegally exacted from them. That can be done,

if at all, only by appropriate civil suits. If the business of respondent has been taken over and is being operated by an individual or individuals in violation of Section 4813, that is a matter for prosecution under the criminal law.

We hold that respondent corporation has been and is violating its charter and the statutes by illegally lending money at usurious rates of interest. It is therefore ordered and adjudged that respondent's corporate charter be and is hereby forfeited, revoked and cancelled; that respondent shall pay as a penalty or fine for its abuse of its charter privileges and illegal acts aforesaid the sum of $5,000.00, and the costs of this proceeding. It is further ordered that such fine or penalty be collected and disposed of in the manner outlined in State ex inf. Taylor v. American Ins. Co., 355 Mo. 1053, 200 S. W. (2d) 1, l. c. 53. All concur.